Next case to be argued, 25-253. And that's Tattari v. Durust. Next case to be argued, 25-253. May it please the court, Paul Zer on behalf of the appellant Neva Durust. The district court committed reversible error in concluding that the appellate Tattari had nate-exeot rights under Turkish law. Turkish law does not create nate-exeot rights in a left-behind parent, first and foremost. Moreover, it is undisputed in this case that the appellant Ms. Durust had sole custody of the child at the time that she left for New York in August 2009. How do we know what the relevance of a protocol that the court adopted in part is on this? The district court took it as being, that's it, your opposing counsel has full rights. You say no rights at all. How do we know? I mean, we have people telling us something about Turkish law, more doubtful than the other, but how do we know? I think that we can look to two key pieces of evidence that Judge Amon overlooked in her opinion. Point number one, piece of evidence number one, is Mr. Tattari's own statement, own admission and recognition at the divorce proceeding about exactly what it is he understood his rights to be at the time of the divorce. Why is his understanding just doctrinally relevant to the question as to what his rights are under Turkish law and what the meaning of that is under the hate convention? So let's do that in reverse, Your Honor. The hate convention doesn't create any substantive law whatsoever. It's a procedural right. Speak right into the microphone, please.  I may have to lean down. It's a procedural rule. The hate convention is a procedural rule that sets out that in the event that someone has a right of custody under the host country's law, then this procedure kicks off. But it doesn't mean that we just look to what the host country sort of says the meaning of custody is to determine whether. I mean, I'm looking at Article V for the purpose of the convention. Rights of custody shall include rights relating to the care of the person of the child and in particular the right to determine a child's place of residence. That's the next right. And so I think then what we do essentially is ask whether under not who had custody in – it's hard to – the questions kind of fall in on themselves. But I think under this we're asking whether Mr. Chitauri had a right under Turkish law in a sense to veto the right to bring the child to somewhere else for permanent residence. That's exactly right. And so I think – so I guess just back to the original question, one sort of subjective understanding, how does that play into the question? Sure. So again – Just a legal – I mean, I think we're doing a legal analysis under 44.1 essentially, right? We're doing – we're doing partly a legal analysis to understand the significance of – to Judge Calabresi's question, the significance of the divorce protocol. But it's also an interpretation question. This is a contract. The divorce protocol is merely a contract. And we're trying to understand what the parties understood the terms of that contract to be. That goes directly to the relevance and significance of Mr. Chitauri's statement about what he understood the contract to be saying. 3.7 and 3.8 are the very provisions that he talks about and acknowledges what he understands his rights to be about. What would happen if we vacated the district court position and held the case and said, in effect, to opposing – to the father, go to Turkey and get us a reading of this? Would that – at that time, if the reading were in his favor and contrary to yours, that there was an oaxeat in the way Turkey read the protocol and the thing, we would then order a convention to act? And if it was not, we would leave it as it is. Would something about that delay change the case? No. That is, do we have time to find out what is really going on? You do, Your Honor. And that's actually one of the errors that Judge Amon made in the end of her opinion. This is the Article 15 process. Well, she said that she could not do that herself. And that may be right. I don't know about that. But would the father have a chance to get that interpretation even if the court cannot? So he's already waiting for that interpretation. He filed a change-of-custody petition in Turkey. And that is going to happen. That is going to happen. The question which the Hague Convention requires us to do expeditiously is what happens in the meantime. Right. And so to Judge Calabresi's question about staying this case, holding this case in abeyance for a ruling from the Turkish court, that is, in effect, the Article 15 process. It is the point of the Article 15. Article 15 is to the ministry, right, not to a court. Well, in the first instance, but the ministry then directs the question. I mean, that's a theory. I think that's a theory of the Hague Convention in which it says that we don't do anything in Hague. There sort of is no. I mean, that would give you ‑‑ I don't think of that as any different. That is to say if we hold the case and do nothing until the Turkish court rules is basically giving no value, no role for the Hague Convention. That's your ultimate ‑‑ I mean, that's everything you want. Correct. Right. Correct. So, yes, we think that that is an appropriate process. I do think that you're right, Your Honor, under Article 15 it starts with the ministry. The ministry inevitably would send that case to a Turkish court. We cite the Turkish submission to the Hague Convention available on the Hague Convention website about the Turkish courts or the Turkish process. No, it's about the Turkish courts. I mean, I just don't know what we know about delay under Article 15 because it does go to the ministry and not ‑‑ Maybe what you're saying is it then from the ministry to the courts. It goes to the courts. That's right. Do we have any sense of what the timing on that is? We know how expediently the Turkish court has been working in this case. It has issued orders in response to Mr. Tatari's motions within days. It is moving the case expeditiously, and there's no reason to think otherwise. There's no evidence that was presented in front of Judge Amon to suggest that it would slow down the process. The court would move expeditiously in Turkey to get a resolution. The other part here is that it is clear that the Turkish court has already made decisions about what Mr. Tatari's rights were in Turkey under Turkish law as of the time of the removal. And this is another key component here. We have to be looking at what his rights were as of the time of removal, not what his rights might become as a result of this change of custody petition. In July 2024, Mr. Tatari filed a motion seeking to prevent Mr. Rus from moving with her son to the United States. Was it to travel? No, it was not. According to his motion, if you look at its appendix, page 737 is his motion, and the order is appendix page 720. His motion, and I can read it to you if you give me just one moment. What was the record cite for? 737 is the motion, and 720 is the order. Well, what seems to me odd about this case is that it is less about removal and more about retention, which is kind of unusual. The coming to the United States pretty well was okay. In most of the Hague cases, it's the opposite. Here, she has no longer a right because he has a right under the protocol, and that makes it a bit different. And because the removal was appropriate, because Turkish law and because the protocol allowed for her to- Well, no. So here, let me go back to appendix 737. His motion sought a bar on her leaving Turkey with the son on grounds that the plaintiff, Mr. Rus, was practically abducting the child, was taking the child away from him, and that the result was that he was completely estranged, the child was completely estranged from his father. Those are the words in his motion. Critically, abduction and estrangement were the words that he used to describe the reason why he sought this relief. His own expert, Mr. Yeltsin, at appendix page 287, admitted that the word abduction is different from short-term travel. It means relocation. It means a permanent move. The motion that he filed was a motion to bar Ms. de Rus, excuse me, from making a permanent move. That's what he was seeking to prevent in Turkey in July 2024. And the Turkish court looked at the divorce decree and said, no, she is allowed to move under the divorce decree because she has sole custody, because sole custody in Turkey means that she is allowed to make these decisions without his consent. What was her response? Oh, I'm sorry. What was her response? Was she saying in her response to the Turkish court, I'm not abducting, I just want to travel to visit family? I don't think she ever had a chance to put in a response because within two days the court entered the order denying the motion. Yeah, but the fact that the court said this is not abduction, you know, the fact that he asked for more doesn't mean that the Turkish court didn't say something less. Look, whatever abduction may be, that's not what's happening here, and that she has a right to do. No, the Turkish court did not expand on or change or modify the terms of his motion. It said very clearly at the bottom of appendix page 720, denial of the motion on the grounds that he is raising. So the court recognized that the concern was abduction of the joint child. That's midway through the main paragraph on page 720. And then at the end, the conclusion is it has been decided to reject the request because the parties were divorced, because the mother has custody. There is no case regarding changing custody in that particular case, and the party with custody rights under Turkish law may use her rights arising from the custody, and moreover, she has the initiative to go abroad. She wants to go abroad. That to me is — Go abroad is different from moving abroad. Well, abroad, go abroad in this context meant moving abroad, because, again, that was the request he was making. The Court's only responding to the motion that he filed and parroting the words that he used in that motion. Nowhere in his motion does he say short-term travel. Nowhere in his motion does he say I'm concerned about these quick, week-long trips. But to the extent the Court in subsequent orders, the content of subsequent orders post the filing, post Judge Amon's decision, issues orders that elucidate on what the Court meant when it issued the order at page 720. Let me finish my question.  I'm jumping to guns. I find it ironic that you oppose the motion to supplement. And I get your point that we should only look at what the district judge had when the district judge made her decision. I get that principle. But I do find it a little ironic that you would oppose to the extent we're trying to sort of figure out what the Turkish Court meant when it issued the order at 720, that we can't now look at what it's doing now to say, hey, hey, what if it's saying, hey, hey, we meant travel. We didn't mean move. So if we can get into the subject. I see I'm way over time. But in terms of the substance of that motion or that order from February 2025, problem number one is that it is nothing more than a chasing order, which this Court has repeatedly said cannot be the basis for making a Hague Convention decision. That is a determination about what is going on now in Turkey. The Hague Convention requires a review of the state of custody at the time of removal.  And that is problem number one of several with that order from February 2025. Problem number two is that it's just saying that it's taking a precautionary step in the event that the child comes back to Turkey. It's not entering an order requiring the child to come back to Turkey. It's not entering an order on any other basis. It's just saying as a precautionary step in the event that the child is back in Turkey, presumably in reference to Judge Amon's decision, that the court would like the child to remain in Turkey pending the outcome of the change of custody proceeding. Again, that is entirely about what is going on in a change of custody proceeding today and not what the state of custody was at the time of removal in August 2024. The last thing I'd say about that order, Your Honor, is that the appellee has not given us any of the supporting motions to understand the context for which the court entered that order in February 2025. We're guessing about the reasons why the court entered that order. We're guessing about the circumstances going on in the change of custody petition. Thank you, Mr. Turley. You do have two minutes for rebuttal. Thank you, Your Honor. We'll hear from Mr. Min. Thank you. Thank you, Your Honors. May it please the court. Speak loud. Apologies. Is this better? Thank you, Your Honors. May it please the court. This case is about the wrongful removal or retention of a child in violation of custody rights, as defined by the Hague Convention, Articles 3 and 5, which are supported by the divorce decree and the divorce protocol that the parties negotiated over a period of several months, that the judge in Turkey approved, and that gave rise to several rights to Mr. Tatari, several rights, not simply 3.7 of the divorce decree or the divorce protocol, but Articles 3.4 and 3.8 as well. Now, the question was asked, you know, the mother traveled, did it become a retention? The question is, what rights were violated on Mr. Tatari's behalf? What did the mother's removal of the child and staying in the United States violate on Mr. Tatari's rights? Well, they violated several rights. One is his right to determine child schooling. In 3.4 of the divorce decree, they listed out schools that the child could attend or similar schools. All based in Istanbul, Turkey. He has the joint decision-making authority to choose schools with the mother for the child. It may be, but it also may be that instead Turkey does not give those rights under the protocol. And that's what I don't understand. I mean, one can read it one way and one can read it the other way. And frankly, in that situation, I'd like to do the thing that does the least harm. So I want to ask you, if we hold, vacate and hold, does your client have a right to go? He has already gone. And get the interpretation that you say is the correct one. And can we then at that point decide in your favor if that's what the court does? And by the way, in rebuttal, I'm going to ask the other side, suppose we apply the Hague Convention and send the child back. And the Turkish court then says, no, there is no exit yet. Can the mother then bring the child here? That is, what I want to know is what under the actual law does the least harm today? Your Honor, I'd like to address both of those questions. I know the second one was not directly addressed to me, but I don't believe my client can seek that relief in the Turkish courts. And here's the reason why. If this was the reverse, we would not be able to go to a court in New York State and say, what are my client's rights under the Hague Convention? That is not a cause of action that exists. But if we hold the case. Sure, but that is not a cause of action that any expert or that anyone opine exists in Turkish courts. To ask the Turkish court, does a right under the Hague Convention exist pursuant to the divorce decree? No, I don't want them to tell me whether a right under the Hague Convention exists. I want them to tell me whether under the divorce decree and the protocol, there is a no exit clause. If there is, and the Turkish court says so, then we can do the Hague Convention. We're not asking them to do it. Understood. But I want to be clear. I think that is a very limited question. That is not the appropriate question that must be asked of any court. Whether a nay exit clause exists. Because that is one right of custody that Mr. Tari has. But he has other rights of custody as defined by, as defined under Article 5 of the Hague Convention, which Judge Nathan talked about before. Which is the right to care for the child. Including school choice, including medical choice, including determining the child's place of residence. So simply asking whether or not a nay exit clause is in place. Okay, let me say then. All we would do is have a result from the Turkish court, which then we would interpret as to whether that gave a right under the Hague Convention. Whatever it is they say. They might say bananas, and then we'd look at bananas in terms of the Hague Convention. But we'd look at it then, rather than without knowing what the Hague court said, what the Turkish court said. Okay, so my understanding of that is similar to a declaratory judgment.  Declaration of rights, not seeking any sort of relief, affirmative relief. Now, contrary to what my colleague stated, it is not my understanding, having gone through a couple of these Article 15 processes, that it goes to the Ministry of Justice. And then they make the request to the court. I do not believe this is a request made to the court. It's a request made to a central authority. And the central authority will then determine how to proceed, whether they can offer an opinion, whether they cannot, how long it will take. We don't know the answers to any of these questions. This is all speculative in terms of what comes next. But what we do know is that it will create some delay. A week, a month, six months, nine months, we have no idea, Your Honor. And that is really the fundamental problem. There is delay, and the Hague Convention doesn't like delay. There's no doubt about it. But if the question is, is some delay necessary to get a right result? Your Honor, can I offer one suggestion in terms of your question of do the least amount of harm? What I believe is the least amount of harm, based upon the question you were going to present to my colleague later on, is if the child is returned, if the mother is right, because she's already filed a case in Turkey asking that my client's, Mr. Tatari's, access schedule, his visitation be modified in lieu of her unilateral relocation. That has not been determined. She can go to Turkey within one day, and she could have done it already over these months, say, I want a relocation. And if she's so right that she has an automatic right to relocation, that should be a snap of a finger. She should get that order in two hours, in one day, in one week, and say, of course, pursuant to her divorce decree, you did have a right to relocate. That is what should happen. That is a cause of relief that exists in Turkey. That is what the expert said she could have done. So we have testimony. We have the evidentiary record to support she can go back to Turkey, seek a right to relocate, and then come back if she's right. That would be the quickest result that would honor the Hague Convention's expedient result that would honor the Hague Convention's prompt return to the country of habitual residence, which no one disputes at this point. And it would allow the Turkish courts to make this determination. I don't know whether that is quicker and more definite than the opposite of having your client, because you tell me one is quick. I'd like to hear from the other, because at least this one has a lot of traveling back and forth. It's very good for the airlines, but whether it's good for anything else, I don't know. I will note here that this is a child that, in essence, grew up entirely in Turkey. So we were talking about harm. This is not a child that would just be taken to a foreign country that he has no experience with. His entire family is there. His life was there. His friends were there, right? So this is not a child that would be so far removed from that country. He's also an American citizen by choice of parties. Of course. But I want to just reiterate that my colleague didn't know. Before you reiterate that, I do have a question. Sorry, Judge Hart. So if you don't mind indulging me in answering my question. Of course. How long has the child been here now? The child has been here for about six months or so. About six months. Here's my concern with delay. Having worked on child protection matters, change is not good. The longer the child is in the United States, the more adjusted he will become to life here, the more traumatic a further change in the future. Is that a concern on your part when being asked about what's the concern about the delay? The longer the status quo, the harder it is to then uproot a child once again. And the claim would be, well, now he's adjusted. He's in a school. He spent a year in a school. He's got new friends. So that works to the mother's advantage and to disadvantage of the father, and that doesn't seem fair either in terms of a delay. But more important than the parents, which often parents forget in these things, is the well-being of the child. They're so focused on themselves, they forget the child. And the child needs two parents, and the child needs stability. And in children who live under a concern that they may move one day or another, it is never good for the child. And the longer things go without decisions, my experience in child protection matters, the worse it is for the child. The only loser in this whole thing is the child. And so I'm asking you, it's been six months? It's been six to eight months. And a delay or a pause, we have no idea how long that would be. Of course. Is that correct? We don't know. And I'm going to answer your question in two parts. First, my colleague in their papers talked, and even in an argument, talked about the fact that the Turkish courts are moving expeditiously, getting orders within days, within weeks of the request being made. And so, again, I invite my colleague, let the mother go back and let her make the request. If they're so confident that the Turkish courts act so expeditiously, they cannot then counter that argument by saying, well, if she asks for relocation, it may take a long time. I mean, they've already expressed their confidence in Turkish courts' ability to act quickly. Now, I will just address your question, Judge Kahn. I think you look at the flip side, too. If this child is ultimately going to go back, what we asked for opposing the stay a couple of months ago or a month ago was that the child's school semester started in February in Turkey, right? And that's what we asked for, to go back and not linger here if this child is ultimately not going to stay here and get readjusted in the beginning of the school year. Unfortunately, that has not happened, but the issue still remains. If the child is not going to ultimately be here, then the longer the child is here, the more disruptive it is to his life going forward. So, sure, you could look at both sides of it. I don't know what the right answer is, honestly. I mean, it is a difficult question. These are difficult cases, for sure. We were negotiating the return of this up until the stay was requested. And I know this is not part of the evidentiary record, but the question about logistics going back, the mother stated, the mother's counsel stated the mother was not going back with the child. The child was going to go back with the father back to Turkey. And then a stay was issued, I think, a day after that. So there's a lot of logistics here at play. When Your Honor talks about the child needing both parents, that's what my client wants, is the child to go back to Turkey where both parents could be in theory. Whether they both choose to be there is another question. That is where the child would have both parents, and that is what we're looking for, Your Honor.  Thank you, Mr. Min. Appreciate it. Mr. Jory, you have two minutes, and I'm going to hold you to it. Understood, Your Honor. Judge Cahn, you're concerned about delay. We're also concerned about shuttling. What Mr. Tatar is suggesting here, through his preferred process, is a shuttling of the child back and forth, which is absolutely harmful to the child right now in the middle of the process. Does the child need to be in Turkey for there to be a decision, if mom were to seek permission to approve the move of the child? Does the child need to go back to Turkey if mom could get an order? No. Assuming they're correct that mom could get an order approving her move of the child. No, but, of course, that's entirely opposite of what they are requesting. The whole purpose of a hate convention petition is to force the child back. No, I'm asking you to respond to their argument that they're responding to your argument that the Turkish courts are quick, so a delay maintaining the status quo would be fine. My question to you, their response is, well, likewise, mom could return to Turkey and ask for a permanent order of the Turkey court approving, if you will, nunk-pro-tunk her move here. Does mother need to bring the child back to Turkey to get such an order? So two responses. One, not being an expert in Turkish law, I don't know, but I don't believe the child needs to go back. Okay. But, two, there's no need for this relocation motion process. The court has already decided it. This has already been decided. Well, I know you say it's been decided. Right. And if we agreed with you, that would be very easy. But if we don't agree with you, that despite the words of Dutch and in the earlier, the issue hasn't been decided, then my question is how quickly will it be decided if we affirm a district court and have you guys go to the Turkish court and say we have a right to leave? How quickly will it be decided if we instead hold not order of a hate convention and have the other side go and say, hey, we have a right to get this child back and therefore go tell us that? That is, how quickly do these things? Again, I do not know, not practicing in Turkey, but what we have is the evidence in front of us from the record that's in front of us that does show that the Turkish family court that has been handling the various petitions and motions brought in front of it has consistently moved the questions in front of it. So for all these reasons, we ask this court to reverse the judgment of the district court. Thank you. Thank you. Thank you to both counsel. The matter is submitted and we will give you our conclusion as expeditiously as we can.